The United States Court of Appeals for the Federal Circuit is now open in session. Doc Sainz, United States, and Honorable Court. Good morning. Thank you. Please be seated. Good morning. We have three arguments we'll be hearing. The first one is Vasudevan Software v. MicroStrategy, docket number 14-1094. Please begin whenever you're ready. Thank you. Les Payne for VSI. May it please the Court. The claim term at issue is disparate databases. All parties agree on what databases means. In particular, structured set of data is the agreed definition. When you add the word disparate, a word that we're all familiar with, it simply means that those structures or schemas in the databases are incompatible in the sense that the data can't be linked. And when I say incompatible, I mean any degree of incompatibility as opposed to the high degree of incompatibility, which is what MicroStrategy calls it on page 32 of its brief for the strict three-part incompatibility test imposed by the courts. Disparate doesn't just mean it's different. It means something more than that? No, in the database context, different is an important word. Of course, we know disparate in general means different. But when you look at the database context and you speak in database parlance as one of ordinary skill will, when someone thinks about disparate, what it means is that the schemas or structures are different. Hence our ordinary definition, incompatible databases having different schemas. But does that mean there are more fields in one database than in another? That would be an example of different schemas or structures. There are many examples. The point is that... Wait, so if you have a database, if you have two databases, and one has five fields and one has six fields, but the five fields are the same in both, and you can do cross-searching across both databases because the second one has a sixth field, that's disparate? Well, if you're trying to join those five fields and everything is common, then they're not disparate. But the point is, on your sixth field, if that's disparate, then it makes the two databases different because they have different schemas and structures. So, this is what I don't quite understand. I thought the whole point of your patent was that if the databases don't operate in any kind of common sphere and can't be searched together or combined together, that that's disparate. But it sounds to me like you're saying that if there's one single thing that's different, then that's disparate. Any degree of incompatibility in the schemes or structures that will prevent the linking between the two databases in your example? I thought you said incompatibility means different schemas. Well, what we have to do is look at the Quartz-Martin order. And the order says... I'm just trying to right now understand your position. You were saying incompatible databases with different schemas. And then I think you were basically telling me that means databases with different schemas. Yes. And so, to follow up on Judge Hughes' question, the only time you would have something not incompatible is when you have identical databases. Because only identical databases are going to have the same schema. That's right. If there is any degree of incompatibility between two databases so that you have to do something to reconcile those incompatibilities or disparities... Basically, aren't all databases different from each other in that sense? There's plenty of databases out there that are essentially genetically identical when it comes to schema. A lot of databases... If you put two IBM databases side by side and they were operated using the same database management system and the tables were set up the same, yes, they would be... Well, let me ask you about that. So, we assume there are two IBM databases. They have all the same underlying thing. But again, going back to my hypothetical, one of them has been set up with five columns of data and one is set up with six. Are they incompatible? If that six columns... are perfectly identical, then those are compatible. When you get to the six columns... But what if nobody cares about the data in the six columns? I mean, I thought the point of it was trying to pull data from databases that don't talk to each other. But those two IBM databases clearly talk to each other. But if the data in the six columns is important in terms of the query the user uses and needs to get that six-column data and it's set up, for example, with a different format, a different data type, a different column name, if it's set up differently, then you can't join the data. It won't work. The point is, when you talk about incompatibility, which the course... I'm trying to get how far this is going. Your argument goes and seems to go pretty far. Let me ask one more hypothetical. Suppose you have these two databases and they both have five columns and they're both IBM. And in one set up, the date, there's a date field. And the date is in the typical, you know, for today's date, 09-12-2014. And in the other one, it switches it and uses it... No, actually, that's going to complicate it too much. In the other one, it uses the words September 12, 2014. Are those two databases incompatible? Absolutely, absolutely. Let me point you to the textbook of Dr. Whitehorn, who is TIBCO's expert at Appendix 58-52-70. In particular, he gives pretty much that exact example. I mean, he talks about disparate databases. He devotes a whole chapter to disparate databases. On the last two pages, he references the hallmark of disparate databases, which is incompatibilities. And he gives that specific example of date formatting incompatibilities. And he says in that very context, where you have a U.S. date format versus a U.K. date format, for example. Not exactly your hypothetical, but similar. But that was the one I was going to use, but that seemed more confusing. I mean, the date is in the exact same format in my hypothetical. It just uses a word for the month instead of a number. The words would be in a different format. That's a different type of data. I can't imagine that if I have two IBM databases and they use a different date format that there's not something already pre-built into the IBM database software that allows me to search for both whatever you call that word format and the other one. You're right. There may be something pre-built into the IBM databases that is able to resolve those incompatibilities. If that's the point of your patent, it would have seemed to have been really obvious. It seems to me that the point of your patent is you have an IBM database that uses a bunch of different fields and then you have a completely different database manufacturer with a different underlying system or whatever and that you want to be able to pull those two disparate types of databases together. I think you put your finger on a great point, which is the VSI invention was never about any specific degree of incompatibility. It was about creating dynamic OLAP cubes versus the prior art static OLAP cubes regardless of whether the source databases had any specific degree of incompatibility. It seems like we've gotten off of that basic point, which is the invention was never about the specific degree of incompatibility. I mean, in column one of the specification, VSI expressly says that the prior art pulled data from disparate databases, from incompatible databases. Well, we've gotten off of it because you're saying... I mean, in your own specification, it says the disparate nature refers to an absence of compatible keys or record identifiers. And I don't see how when you have... Going back to my first hypothetical, if you have two IBM databases and they share five code or five values the same, that there's an absence of compatible values. There may be one value that is not present in the other, but that doesn't seem to me there's an absence of compatible values. If you look at that six columns and there's an absence of compatibilities, then it makes the two databases disparate. I mean, if you want to focus on the first five columns and they're perfectly compatible, then, yeah, that aspect isn't disparate. But when you add the other aspect, the sixth column that's different, that makes them disparate. So if you try to pull data from that sixth column, you need a special software tool. But again, the invention wasn't about any specific degree of incompatibility. You referenced the specification. Why would you need a special software tool? I mean, if you write whatever you're searching is and include that sixth field, it's going to pull it from the database that has the sixth field. And since there's not a sixth field in the other one, it's not going to pull it. The reason you need it from a technical standpoint is because databases are governed by the database management system, which is a proprietary structure or scheme, if you will, that each database manufacturer uses. And based on that proprietary structure or schema, all of these databases are going to be different or incompatible. They can't be linked unless you have a special software tool that resolves those incompatibilities or disparities. And if you look at the ordinary definition, which takes into consideration that there's this general consensus, which is referred to in the Markman order of incompatibility, you have to ask yourself, how do you describe that incompatibility? The ordinary definition... I have a fallback position because I'm going to be frank. I find the district court's construction somewhat baffling. And it seems to be too onerous. But the position you're asserting here today seems to go way too far the other way. Do you have a claim construction of district that doesn't depend on a tiny kind of difference between, for example, the month-day format in numbers and words? Yeah, sure. You referred to that first sentence. That's actually in the prosecution history, of course. To be clear, the court and the defendants don't rely on anything in the specification. They put all their eggs in this one basket, which is the 2003 Office Act response. So let me point you to a sentence in response to your question, which is the fourth sentence, the last sentence in that paragraph, since you focused on it. And that says, the disparate nature extends to. We know what extends to means. It covers. It includes. And one critical error that the court made is that the court entered a very narrow claim construction that excludes those very examples that we put the public on notice should be included. So if you just look at that fourth sentence to answer your question, you could say disparate databases means incompatible data structures, incompatible structures or schemas in the different database types, e.g. IBM, Oracle. It follows right from that sentence. Well, that makes a lot more sense to me. But your notion that they have to be completely identical to be not disparate doesn't even seem supported by that. I have that whole paragraph and it seems like the second sentence refers to an example of a common key value as a social security number. So if you have two databases and they both use the social security number field, even if other stuff may be different, are they disparate or not? Absolutely. That's just one element of disparity. It seems like you're taking your position too far there. If the databases have two common key values, well, that's an example. If you have an absence of common key values, that would be one example of disparity. If you have the same common key values but you have some other form of incompatibility that prevents linking, and maybe that's the element we're missing that prevents linking. If you have some other form of incompatibility or disparity, then those databases will also be considered disparate. The Jones reference had common keys, correct? Correct. And you were distinguishing over Jones. So I guess one way of reading the prosecution history is your invention, disparate databases, whatever that means, it doesn't have common keys. You've somehow figured out a way to enable linking data from different databases by some other way than common keys. If you're saying your claim in certain circumstances will use common keys, then it seems like there's a problem. In certain circumstances, the sentence that you're pointing to is the third sentence in this prosecution paragraph at issue. Let me quote that sentence. It says, In embodiments of applicants' invention, such a common key value is not necessary. Let's break that down. If you look at the entire paragraph, what we're giving is examples. We're not trying to lend ourselves to an example, but with respect to that particular example, look at the prefatory language. In embodiments of applicants' invention. The error that the district court made is that it construed in embodiments to mean all embodiments, all examples. We know what embodiments mean. They're merely examples. If you look at the second part of that sentence, such a common key value is not necessary. Is not necessary. What does that mean in plain English? The best interpretation is you may or may not have it. It's not necessary. If you have incompatible key values, that's one form of disparity. If you don't have common key values, or if you have common key values, rather, and you have some other form of disparity, then the databases are still disparate by definition. Maybe your invention doesn't need common keys because you've invented something else. You're claiming something else, like maybe correlation parameters. And back to your point about we did not distinguish on that ground. The fairest reading of the prosecution history, and in particular that Office Act response, is that the closest we came when we distinguished the Jones-Prioroff reference, which you're referring to, is based on the plurality of disparate databases. With the emphasis on plurality because Jones had only one single database. Would you agree that if on this page we read this passage as serving as a glossary, as a definition of the term disparate databases, and so now regardless of whether this paragraph is being used to specifically overcome the Jones reference, nevertheless, we now have a public record where you are declaring what the word disparate databases mean. And so we're obligated to try to figure out the best we can what the scope of the claim is in light of this passage. And if you read it that way, which of course we disagree with, then the critical take-home point today is that no matter what words you use to capture the construction, the breadth of those words must be great enough to capture the examples given in the fourth sentence that I mentioned. Namely, incompatible structures or schemas in different database types. I'm sorry, go ahead. I'm sorry, I'm exhausted. If you look at that paragraph and look at everything stated in that paragraph, the District Court focused on the first sentence or two, but I think that's important because that first sentence sort of sets the tone for everything that follows and says specifically, the disparate nature of the above databases refers to an absence of compatible keys or this or that. And it continues to say that would otherwise enable linking data within the constituent databases. Hard for me to read that as referring to databases that have any linking data. It's just the absence of anything that would otherwise enable linking data. And that, to me, is entirely consistent with what the District Court held. Why am I wrong? Because the ors are critical there. There's two. Even if you were to take that sentence as a... It's skipping the or. It's just going right from the beginning. The absence of certain things, A for B for C for D, that would otherwise enable linking data. In other words, if there's anything that does enable linking data, any one thing, it's not disparate. Well, and that's where the context comes into play. It's so important that we said or. It's so important to consider that fourth sentence. The context is that any type of incompatibility will prevent linking data. If you look at Dr. McLeod's report, and I refer you to A4805 through 06, A52-53 through 54, and A54-14 through 15, you see that he very clearly said that any type of incompatibility or disparity, and give specific examples, will prevent the linking. So if you take that sentence, Your Honor, which ends in, you know, that would otherwise link data, what it's talking to you about is it's giving specific examples of where if you have those incompatibilities, the data won't be linked. It doesn't say and. The court changed the ors to and. Why would it not be possible if you have, in the hypothetical we started with, one database with four fields, another database with five fields, that would mean that there are four common fields. So that would be four opportunities to link those two databases. Again, if the fifth field is set up in the same scheme or structure, if it has the same formatting, the same type of column name, et cetera, then that fifth field could also be linked. But in the hypothetical, as I understood it, that fifth field was somehow different. And so it couldn't be linked because it was set up different, it had different schemes or structures for whatever reason. But back to your point on the first sentence, there's two other errors there, even if you say that that's some sort of definition. You know, you can't change the or to ands. The court's precedent is very clear that to have some narrow special definition or disclaimer, you have to have clear and unmistakable evidence. In other words, it has to be clear that when we said or, we meant and. And that's, as the court calls it, and I'm using the court's word here, counterintuitive. That's counterintuitive. Thank you, Your Honor. Okay. Mr. Peck, you're going to be sharing time with Mr. Appletee, right? That's right, Your Honor. Okay. May it please the court, Sean Peck of Quinn Emanuel on behalf of MicroStrategy, and I am prepared to address both the summary judgment of non-infringement as well as the enablement motion. The written description motion was something that was brought up in the Tipco case, and the co-counsel handled that as well. Mr. Peck, give me your strongest argument or your strongest basis to conclude that there's a genuine issue of material fact on enablement. That there is not. That there's not, I'm sorry. Yes, absolutely. That there's not. I could do that as well, but I'm not sure my client would be happy. That there's not. Your Honor, if we step back and we look at the exceptional facts in this case, and they're exceptional for two reasons. Number one, they're undisputed. So we're taking everything that Mr. Rasutovan put into his declaration and the sworn testimony that he gave in his deposition which has not been retracted. So it's very unusual to actually have an inventor testify under oath about the exact amount of time, not that he spent on the overall software, but on the specific limitation at issue, which is how long did the inventor take to actually enable a working prototype which would access these disparate databases that we've been discussing using commonly available tools at the time and with the patent specification in hand that he wrote. Very unusual because his declaration actually excludes time for bug fixes, time for other features that he worked on. And what those facts reveal, Your Honor, is two things. One, not only the inordinate amount of time because even by their own math, it's about 2,700 man hours to 3,600 man hours. And as Judge Seaborg found, although Mr. Rasutovan may be somebody who works extraordinarily hard, the right standard has to be a reasonable man hour standard. We're talking about what would it take for one of ordinary skill in the art to do this type of experimentation. And so if we apply a 2,000 man hour standard for one year, 2,700 to 3,600 man hours clearly exceeds one man year of time. But more importantly than the time, Your Honor... Don't the respective experts have different takes on that? No, Your Honor, because the only issue that was raised in the expert declaration from Dr. Cardenas, who's BSS expert, he only has one paragraph on the actual amount of time. And in that paragraph, he says, I understand that Mr. Rasutovan spent about a year, man year, working on this product, and I don't think one man year is necessarily undue. That's all he says. But the problem with that opinion is it has no really any bearing on the actual facts of the case because he doesn't address the fact that the actual time was 2,700 to 3,600 man hours, which exceeds one man year. Two, he never addresses the critical facts, Your Honor, which is that he didn't simply have routine development with the patent specification in hand toward a working product. He tried three different times and failed. He took the product that was actually described in the patent, which he later admitted actually didn't practice the invention. Those are the figures in the patent specification. He took the teachings of the patent specification that he wrote. He failed the first time. Then he failed again. And he failed the third time. And, Your Honor, I want to know something that's actually quite an important initiative. What did your experts say on all this? Well, Your Honor, we did have expert reports in the underlying case that were not submitted as part of the summary judgment record. Obviously, our experts believe that this is completely undue experimentation. Right now, you're saying we don't have anything We don't have anything on the record from our expert on this issue. What we do have is we have their expert declaration, which is the only thing that they put into the record, which only talks about one man year of time. But what we have, and the reason why we're trying to focus on the undisputed facts is we understand that typically enabling questions are factual issues. What we have here is we have undisputed testimony and sworn declaration from the inventor himself, which indicates that he tried three times. And the most important testimony he gives is, at the very end, he says, I had to develop a wholly different new infrastructure by the time that he was able to figure this out with his fourth try. What should we be looking at? Should we be looking at raw number of hours, or should we be looking at his testimony about starting, stopping, and then starting over with some new model? Your Honor, I think you look at it actively. Because in terms of number of hours, I don't know if there's anything in the record that says anything over 1,000 hours is automatically undue. Right? We don't have a measuring stick to really understand. I mean, yes, thousands of hours sounds like a long period of time. But, you know, not all software is created equal. The nature of the invention matters. And that seems like kind of a fact question. So just to address the first question, Your Honor, you have to look at it all. I mean, what the Fed Circuit cases all say about enablement is that you look at the entire factual record. And here, I think it's not only the time, but it's the fact that he tried with the patent specification in hand and failed multiple times. And we have, for Your Honor's guidance, the white consolidated case, which specifically said, in that case, the facts were very similar to ours, where the estimated amount of time was one and a half to two man years of development time. And the Federal Circuit in that case found that that was a clearly unreasonable requirement. But that's not all. We have the AKCO case and the Ormco case, which says that when an inventor who is of extraordinary skill because of his experience working in the field tries at the time of the invention and fails repeatedly, then that is also strong evidence of lack of enablement. So both of those cases, lines of cases, the AKCO line of cases, the Ormco case, as well as the white consolidated case, gives us all we need because the facts are undisputed. He spent many thousands of hours. He tried many different pieces of software. And at the end, and just to give you Your Honor's citation, it's A2929, where Mr. Vasudevan, under oath, admits that when he finally came up with the solution, he had to develop a whole new infrastructure to support the capability of accessing different databases. So I think when you add all those facts together, Your Honor, I don't think that there's anything missing here. This is an exceptional set of facts. We're not asking for a change in the law. I think all we're asking is that when you look at this unique set of circumstances, when you have this crystal clear record of what transpired, how much effort was undertaken by a man that is described by their experts with extraordinary skill to have done this, then I think it's a pretty clear indication that there wasn't no enablement. You want to talk a little bit about the claim construction? Yes, Your Honor. I'm very much going to appreciate that. Why can or mean and? And what about that fourth sentence in the prosecution? Yes. And Your Honor, I'd like to address your questions first, and then if I could just have an opportunity to address some of the things that came up in the first line of arguments. If you still have time. Okay. Why does or mean and? Because number one, what is this invention? And I believe Your Honor addressed this issue. This invention is not about accessing any kind of database. It's about accessing disparate databases. And it's clear from reading the intrinsic record that accessing disparate databases means accessing databases without using any of the prior art techniques that were already well known for accessing those types of databases. For example, common keys or record identifiers that give you the same value. Those were all well-known prior art techniques. That's what those skilled in the art would understand. That's what Mr. Vasudevan understood when he filed a patent application. So the reason why the ors that appear there are truly ands in terms of the negation which precedes it is that he was telling the world in the patent office, look, if you want to use my, what I'm claiming as my invention is the ability to access different databases without using any of the following prior art techniques. Completely logical statement. And that's what's reflected. And that's why when he, when BSI analyzes Jones as a prior art reference, they don't go through and look for all three prior art techniques. You know, the claim language here is baffling and not particularly well-written. But I'm still struggling with, you both seem to have very extreme positions. His position is if there's one minute little thing different then it's different. And your position seems to me that if there's one minute little thing in the same, it's not disparate. But I don't know how we read it like that. What if there may have been some commonality but it's still because of the commonality it wasn't useful enough to allow accessing both databases. Wouldn't that be enough to be disparate? Well, I think it goes back to the prior art techniques, Your Honor. And to the extent that there is a compromise here that you're contemplating. I'm not contemplating a compromise. I'm just trying to figure out what the claim language means. I think the claim language means that there were three prior art techniques known. Common key, compatible keys, record identifiers of similar value or format, which everybody agrees is a subset or a special type of compatible key. All that BSI was saying and all that Judge Seaborg found is... So I don't know the prior art and this may just be wrong. But suppose you have two different databases and they both use a social security number as some kind of identifier. But because of the underlying structure you still can't draw simultaneously from them with known techniques. Would that be disparate? No, Your Honor. If it doesn't use... What I would say is at the time of this invention giving deference to the definition that was provided. If you could not use... You have to be able to use the common keys or record identifier values to be able to... Wait, so your answer is even if they do have... both have social security numbers if they can't be used to simultaneously access data they're disparate. Well, the thing about common key value... So the way it works, Your Honor, is you have a joint operation. Common key means that if I have two databases whether they're from the same vendor or different vendors. If I can choose a column that happens to have values that line up with values it doesn't have to be that there's a unique set of all the values appearing but if there's at least a subset of values that I can use as keys and I have the ability to join them across these two databases then what that allows me to do is if one database, for example, has a social security number that tells you the employee names and another database has a social security number telling you the salary values that that allows that joint operation to take place. So I think to answer your question, Your Honor, is what's clear from the record is they identify three prior techniques. If those three prior techniques, if any one of those three prior techniques can be used to join those databases then what that means is you have databases that are otherwise able to link together using prior techniques. That is not BSI's invention. And I think that's the most clear basic example. And just to address the last point on, for example, the statement that happens at the end, George Seaborg provided a clear justification why that exemplary statement should not trump the definitional statement that appears. What he says is there is no reason why databases from two vendors would necessarily have common keys. In fact, it may be that they lack common keys, in which case you have disparate database that don't use common keys and they're from different vendors. And I think that's the point of that last sentence is that disparate nature could extend to different kinds of configurations in which you don't have common keys, record identifiers, of similar value and format. Okay, thank you. Thank you very much. Robert Ackleby for TIBCO Software. May it please the Court. I'd like to start just by addressing briefly the claim construction. We've obviously had a lot of discussion about it. But I think what is unmistakable in the prosecution's history is that the definition of disparate databases excludes common or compatible keys. And if you look at that passage where they're discussing Jones and Jones reference in particular, the common or compatible keys is data information that exists in the two databases in which you can link the data between the two databases. So the social security number is a classic example. If there's a social security number in one database and a social security number in another database, that data information that we can use to link those two databases is a common or compatible key. If you had a... So that's my question. And it may just be I don't understand databases in the state of the art at the time. And maybe what I'm thinking about is just was it a problem? But even assuming you had those two common keys of the social security number, couldn't there have been a situation because of the way the underlying software was done that you still couldn't access the two databases together even if there was a common key? The common key focuses on the data information. So I don't believe there's a situation where the underlying software would just eliminate the ability to actually access that information. We can query the one database. We can query the other database and we can get that information. And in a reexamination proceeding, VSI very clearly said that the connection methods to query those data from each of those databases does not relate to the concept of disparate databases. That record site says in our briefs. So it's okay to just use basically the common key and query the databases separately to pull the data rather than send one search to both databases? Well, when you're doing it, you're searching plurality of databases, but you're querying those databases and you're pulling the databases from those two databases and joining the data together. It's the join operation which is fundamental here and what... Okay, I think I get it. What Mr. Vasudevan was saying is that conventional join operation is something that's outside the scope of my invention. But you're pointing to a passage in the prosecution history where the opposing counsel was telling us that they were distinguishing Jones on a host of grounds, not just this particular one. So to what extent can we really rely on that? I... In... For instance... Well, in overcoming the rejection of Jones, Mr. Vasudevan specifically amended the claims to introduce the concept of disparate databases and at that time discussed what disparate databases meant and unequivocally stated that disparate databases excluded the concept of common keys. Stated unequivocally that in embodiments of applicants' invention, common keys are not necessary and then criticized Jones on the very next page for its use of common keys. So yes, they also... It's unequivocal because of DeMorgan's Law? I don't think you need to go to DeMorgan's Law at all. It's unequivocal that Mr. Vasudevan criticized Jones for its lack of common keys, distinguished Jones on that basis because common keys were used to link data in Jones and what Mr. Vasudevan was saying is that in my invention I'm not linking data using common keys. Those databases that do not have common keys are disparate. I found a way to link data between disparate databases. One of the prior solutions to linking data to disparate databases was the so-called intermediate database and the full import of what they're saying in that prosecution history is I can remove the intermediate database because I found another way to directly join data from disparate databases. That was the distinction that was being made. Is that the correlation parameters? Well, that's what they claim in the specification. If I can turn to the written description argument. Could you go back to that fourth sentence in the prosecution history? Yes. Disparate nature extends to all these different kinds of databases from different manufacturers. Actually, the statement says different types of databases and the structures and schemas. That sentence, as the district court I think correctly found, was merely exemplary in discussing the types of databases where you might see such disparateness. Some of those databases might have common keys. Some of those types of databases might lack common keys. The fundamental point of the definition of disparateness was the lack of compatible keys or record identifiers of similar value or format that would link data. I guess you're saying the fourth sentence really serves more to provide context for how disparate databases would work and it's not really an example of what disparate databases are? It provides context. I think that's a good way of looking at it. It provides context to the types of databases that you might see such disparateness, but Mr. Vest unequivocally defined what the differences between those databases, what differences really mattered and the difference that he said mattered was the ability to find data in those databases that otherwise enabled you to link the data between the multiple or plurality of databases. If I could quickly turn to the written description point because you did ask me about correlation parameters. At the time the application was filed, based on the undisputed fact, Mr. Vest and David did not possess an invention that would actually link data between disparate databases. Really there's only one passage. Do you have an expert declaration? We did not submit an expert declaration in the context of the summary judgment. The other side did. Yes I did, but if we actually look at that expert declaration and they talk in that expert declaration there's approximately they point to say they say 10 pages on the issue of written description, but if you actually look at those 10 pages and it's A4246-56, almost all of those pages are simply block quotes from the specification and in fact there's page after page of a chart comparing the provisional application to the ultimate specification, but there was no issue in dispute about whether there was some difference between the provisional application and the specification. So it's not any clear why that information is in the declaration. Just assume for the moment I'm not a skill in the art here and I have to be able to decide whether as a matter of law there's no factual question here on written description. So if you zero in on the very passage in the declaration where the expert contends that there's disclosure of this ability to link data between disparate databases, it's on A4247-48, the passage in the provisional application. Nowhere in that passage does it discuss incompatible databases or disparate databases. There's reference to correlation parameters, but there's no discussion at all about how they might link data between disparate databases and the discussion on its face is about MIDUS. You can see that right in the discussion. MIDUS, and this is undisputed, MIDUS at the time the provisional application was filed was incapable of accessing and retrieving data from disparate databases. It's undisputed in the record. So that passage which describes MIDUS on its face cannot show possession of the invention by a burden of proof. By clear and convincing evidence. If we look at their additional facts, the database that Mr. Vastavadin suggests for use in the specification, ultimately he was not able to create a system that accessed disparate databases using that system. He tried two other databases, failed each time, and ultimately he claims to have succeeded by developing new infrastructure or new capability, A4012, he talks about new capability developed by BSI three years later. That new capability is nowhere disclosed in the specification. It's that new capability that allowed him, if at all, to access disparate databases. He didn't possess that. So this is a version of Mr. Pack's enablement argument, right? I think the facts are related between written description and enablement, but I do believe they're independent. The question in written description being, did he possess it at the time he filed the application? I think the unspecified evidence shows that he did not. In enablement, did he teach those skilled in the art how to do it? And armed with that specification, his own specification, and his own expert called Mr. Vastavadin someone of high skill in the art, he failed over the course of at least 2,700 hours, more than a man year. The district court found, after looking at the evidence, that a man year was 2,000 hours per year. After all that time, the final thought... My final thought is, if you look at page 24 of their reply brief, you'll see at best the correlation parameters refer to common keys. That's their very characterization on page 24 of their reply brief. Thank you, Your Honor. Thank you. Mr. Payne, let's... Can we give him an extra two minutes? How much time does that leave me? That'll leave you with a little over... Well, let's go  and 30 seconds. Thank you, Your Honor. Let me address Judge Hsu's question which you've asked us a couple of times and you've asked my friends over here about a minute incompatibility. I want to try to put this in context because, as you've said, it's baffling. We keep on talking about compatible values. When you have two databases and they have key values that are compatible, I want to be clear that if you have some other disparity that will prevent linking, then those databases are incompatible and disparate. By definition, in that context, it's not a minute incompatibility or a minute disparity because if that so-called minute disparity or incompatibility actually prevents the linking, which is the context, Your Honor, then it's important. It's significant. So we've talked about date formats, for example. One can't call that minute when, in fact, it has a different format. Let me go back to the social security number context. Suppose you have two databases that both use social security numbers to look up employee records. And database one has employee records with three different categories. Database two has employee records with three completely different categories. I assume you think those are disparate because the categories are different. I'm not sure what you mean by categories, but yes, for example, if the categories were different because they were stored in the structures of the databases differently or in the schemas differently, then by definition That's not what I mean. Okay, I'm sorry. This is all baffling, but what I mean is in database one, the categories are the person's job title, their salary, their date of entry. In category two, or in database two, you still have the person's social security number, their name, but it stores their home phone number, their work phone number, and an emergency contact number. There are different values, keys there, I think, or columns there in each of them, but are those incompatible? If the columns you're talking about are perfectly compatible, as far as... Everything else is the same. They're both Oracle databases. They're both structured the same way. It's just that when you look, I mean, maybe I'm looking at this in a very thing way, but when I'm looking at a spreadsheet that has categories, I thought that your answer was if there's a difference between categories on either of those spreadsheets, it's incompatible. But it seems to me it's pretty clear that on these two databases, if you want to gather all the information about certain employees, you type in their social security numbers, and it's going to draw from both of them. If there's a disparity, and this is absolutely critical, that prevents the linking in those columns you're talking about with respect to the social security numbers. If there is some reason that rises to the level of an incompatibility or disparity, that prevents the linking. What does that mean? It just means the structures and schemas are so different. But I just told you they're both Oracle databases. You use the same search function. If you search one by social security number, you're going to get all the data of the categories in database one. If you search the second one, you're going to get the same data, it's just different data. And then you have the data under both databases. It sounds like in your example you have two perfectly compatible databases because you can actually link the data because they're formatted the same, they're in the same structures and schemas and they're both, I think you said, Oracle databases. But this is not what I understood you to be telling me on your opening argument. It seemed to me you were suggesting that any difference between the two databases was enough to make them disparate. And I may have misunderstood your question. It seems like you've staked out a pretty extreme position. What I'm saying is that if you're trying to link two specific people and you can't do it because of any degree of incompatibility, then by definition it's disparate. It's disparate. I mean, if you have this six column in your original hypothetical, if that six column doesn't for some reason prevent the linking, then that's not a problem. But if you're trying to link data and there's some incompatibility that prevents you from doing it, then it's disparate and it doesn't matter the degree. I mean, we've used the word minute. That's not really a fair word because this invention is not about the degree of incompatibility. The invention is about creating these dynamic OLAP cubes from district databases regardless of their degree of incompatibility. And if they have any incompatibility that prevents the linking, that's good enough. Let me go to the fourth sentence because you asked about it. And it expressly says, I can't emphasize this enough, it expressly says that disparate nature extends for example too. It is an express set of examples that anyone reading that fourth sentence would know have to be captured by the construction. Extends to for example. That is the only way to interpret that sentence. In the court, in a major critical error, gave no weight, no weight to that sentence. He just said my construction is not necessarily inconsistent with the fourth sentence. But that's the same thing as just saying the fourth sentence is superfluous. You have to give it that expressly because it says the disparate nature extends to for example. Mr. Payne, you said a minute ago that if there are databases that are different in any way that would prevent linking, they are disparate. If there are differences in the structures or schemas that will prevent the linking, yes, they are disparate. If they are incompatible in that sense. Incompatible, I mean, I know this is database technology. But it's different in a way that prevents linking. So are you saying that this invention therefore does not rely on linking and that's what makes it an invention? That it operates in some other fashion? You have to have a special software tool to reconcile those disparities or incompatibilities so that you can link. That's the point. What special software tool are we talking about? And where is it disclosed? It's disclosed in figure six of the spec. And for example, throughout the specification, I refer you specifically since we discussed it, to Dr. Cardenas' both his declaration and his expert report as we pointed out, they don't have any testimony from their expert. Let me refer you to specifically A2694-2708 and A2718-2728. That's the Cardenas report. There are 25 pages there that we shortchanged ourselves in the briefing. There are actually 25 pages there that deal with written description and enablement. 25 pages that the court called quote, conclusory. In the face of no expert testimony on the other side, it's not conclusory. I encourage, strongly encourage the court to read those 25 pages. And let me give you the deck side as well which is A2552-57. There is a lot of information in Dr. Cardenas' testimony that the court gave no weight to. On summary judgment, you know you can't do that especially when the other side doesn't have any. And one final point, if I may, about this, what happened in the Office Action Response and whether we distinguished on the disparate ground. Our position is clear. We did not. We distinguished on the plurality ground. But let me humor the defendants in the court. Let's assume that we did distinguish Jones on the disparate ground. We have to look at how that would play out. What is the context? Now consider how that would play out. Jones doesn't have any incompatibilities. So to distinguish over the Jones, all we have to say is any degree of incompatibility. You could say a minute degree because saying a minute degree of incompatibility still distinguishes over Jones. The only way the construction of a high degree of incompatibility would be justified is if Jones had some low degree of incompatibility and we were trying to distinguish on that ground and we had to go to some high degree of incompatibility. As it were, Jones had no degree of incompatibility. So even if we distinguished based on disparateness, which we did not, it still doesn't support the court's construction of a high degree of incompatibility. Okay, Mr. Payne, you're way over your time. Thank you. I appreciate the court's time. Thank you very much. Case is submitted.